UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                         Plaintiff,<br>    v.<br><br>DAMIEN LOREN JACKSON,<br><br>                         Defendant. | CASE NO. CR92-1781-RJB<br><br>ORDER DENYING DEFENDANT'S MOTION TO REDUCE SENTENCE |

This matter comes before the court on Defendant Damien L. Jackson's Motion to Reduce Sentence (dkt.##231; 277). The court has considered the pleadings supporting the motion with supporting documentation and exhibits, the response by the United States, supplemental pleadings filed by both parties, and the record herein. Based on the following discussion, the court determines that this motion should be denied.

                    I.       FACTUAL AND PROCEDURAL BACKGROUND

   A.  Factual Background.

Along with the Plea Agreement, Jackson reviewed and signed a seven page Statement of Facts (dkt.#54 sealed), which set forth the details of the preliminary investigation of Jackson and his co-defendants, Gregory Paige, Jackson's older half-brother, and James Mayfield, supporting the two charges against him. This summary comes from the government's Response to Motion for Compassionate Release, dkt.285, pp.2-5.

Beginning in November 1992, law enforcement worked with a confidential informant regarding drug trafficking by Jackson and others including his co-defendants. A search of Jackson's residence, where he lived with Paige, uncovered cocaine base, packaging materials, a firearm, and a significant amount of cash. The two were arrested.

Upon their release from custody, Jackson and Paige had reason to believe that Allen King was the confidential informant that cooperated with police. All the defendants knew King and his wife, Lisa, in part due to Jackson's time in the military and from social and drug business interactions. Jackson knew that King had three young children, and the family lived on the Fort Lewis Military Reservation (now Joint Base Lewis McChord or JBLM). At the time, King's wife was deployed to Korea as a member of active-duty military. Because of their unsubstantiated belief that King was responsible for their arrests, Jackson and Paige determined that King needed to be punished for his cooperation.

After detailed planning, Mayfield drove Jackson and Paige to King's residence on the night of December 4, 1992. Paige remained in the car while Jackson and Mayfield entered King's residence. Upon entry, the two attacked King with knives and/or machetes, inflicting approximately 65 chopping type wounds on King, and brutally killing all three children, aged seven years, four years and 18 months. The descriptions of the victims' wounds are too graphic

to describe herein. The government believed, and Jackson agreed, that he killed King with Mayfield and the two youngest children while Mayfield killed the oldest child.

After the murders, Paige picked up Jackson and Mayfield and drove to a motel room that had been specially rented to enable Jackson and Mayfield to change their blood-soaked clothes, shower, and dress in clean clothes. The bloody clothes were burned.

Jackson flew to Southern California where he was arrested and returned to Tacoma. Initially, the government filed drug charges against Jackson but told Jackson's attorneys that it intended to file charges of premediated murder in the coming months and would likely seek the death penalty. Investigations and negotiations began between the government and Jackson's attorneys with the goal of avoiding the death penalty. The parties fashioned a Plea Agreement to one count of possession of cocaine base with intent to distribute with an agreed recommendation to 120 months in custody, and one count of murder with premeditation for a mandatory life without parole sentence. With such an agreement, Jackson avoided the potential of the death penalty if Jackson went to trial and lost.

B.  Procedural Background

On May 12, 1993, defendant Damien Jackson, then 20 years of age, pled guilty to one count of drug trafficking in violation of 21 U.S.C. §§841(a)(1) and 841(b)(1)(A), which carried a mandatory sentence of 120 months, and one count of premeditated murder (murder in the first degree) in violation of 18 U.S.C. §1111, which carried a sentence of death or mandatory life imprisonment. Pursuant to the terms of Plea Agreement, the parties jointly agreed to the mandatory 120-month sentence on the drug count and the mandatory life sentence on the murder count to run concurrently. Dkt.#56. Sentencing took place at the same time as Jackson's plea and

the court sentenced him to life imprisonment. Dkt#51. To date, Jackson has been in continuous custody for approximately 32 years and is now 53 years of age.

On February 9, 2023, Jackson filed a pro se Motion to Reduce Sentence Pursuant to 18 U.S.C § 3582(c)(1)(A)(1). Dkt.#231. Thereafter, defense counsel appeared to represent Jackson. Dkt.#236. Several motions were filed, and orders were entered, setting and resetting a briefing and noting schedule. Dkt.##238-274. Defense counsel filed a separate Motion to Reduce Sentence with 24 exhibits, all under seal. Dkt.#277. The government filed a Response to Jackson's Motion to Reduce Sentence along with three exhibits. Dkt.##285; 287(sealed). Jackson filed a Reply and response to the court's letter regarding the application of *United States v. Bryant*, 144 F.4th 1119 (9th Cir. 2025). Dkt.#289. With the reply, Jackson filed eight exhibits. Dkt.#297-1-8. The court has reviewed all pleadings and exhibits.

## II.    AUTHORITY AND DISCUSSION

A. Controlling Law.

The defendant brings his motion pursuant to 18 U.S.C. §3582(c)(1)(A), which gives discretion to the court to reduce a sentence pursuant to what has become known as the "compassionate release" statute. *See United States v. Brooker,* 976 F.3d 228, 237 (2nd Cir. 2020). When first enacted, only the warden of a prison could file for compassionate release on behalf of a defendant. But with the passage of the First Step Act of 2018 (FSA), Congress amended 18 U.S.C. §3582(c)(1)(A) to allow a defendant to file such a motion after he exhausted his administrative remedies with the Bureau of Prisons (BOP). Here, there is no dispute that Jackson has exhausted his administrative remedies. See Ex.s 3 and 4 to dkt.#277.

As noted by the U.S. Court of Appeals for the Ninth Circuit in the *Bryant* decision, *United States v. Bryant*, 144 F.4th 1119, 1123 (9th Cir.2025), finality of criminal judgments is

the basis of our justice system. "Once imposed, a sentence may be altered only in very limited circumstances." *Id*. (citations and internal quotations omitted). When presenting a motion for compassionate release, the defendant must prove three conditions. Those conditions are well set out in *United States v Wright*, 48 F.4th 938, 945 (9th Cir. 2022) as follows:

> First, the district court must determine whether "extraordinary and compelling reasons warrant" a sentence reduction. (quoting 18 U.S.C. § 3582(c)(1)(A)(i) ). Second, the court must evaluate whether a reduction would be "consistent with applicable policy statements issued by the Sentencing Commission." (quoting 18 U.S.C. § 3582(c)(1)(A). Third, the court must consider and weigh the factors set forth in 18 U.S.C. § 3553(a) to decide whether the requested sentence reduction is warranted 'under the particular circumstances of the case . . ..

The "policy statements" referred to are found at U.S.S.G. §1B1.13 and define what are "extraordinary and compelling reasons". *Bryant*, 144 F.4th at 1123. Those reasons "include (among other things) terminal illness, severe physical or mental decline because of the aging process, and the death or incapacitation of the primary caregiver of a defendant's child." *Id.* at 1124 (citing §1B1.13(b)(1)-(4)). This section also provides for "other reasons" that are reasons "similar in gravity" to those listed in the section. §1B1.13(b)(5). Because the examples of extraordinary and compelling reasons and the policy statement are set forth together, the court will discuss them together.

      B.  First and Second Steps – Extraordinary and Compelling Reasons and Relevant Policy Statement.

Jackson argues that there are three extraordinary and compelling reasons why he should be granted a sentence reduction. First, his mother, Carol Jackson is suffering from multiple and serious health problems and needs daily assistance in all manner of life. This circumstance comes under the policy statement in §1B1.13(b)(3)(C) "The incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent."

Second, Jackson argues that there are "other reasons" referred to in the so-called catch-all subsection, §1B1.13(b)(5), such as the court did not have information about Jackson's characteristics at the time of sentencing, such as his age and difficult upbringing in a violent city; geographic anomaly; need to care for his mother, and his rehabilitation. Third, Jackson argues that his sentence is unusually long under §1B1.13(b)(6) because of changes in law regarding the consideration of the youthfulness of the defendant at the time of commission of the crime. Additionally, Jackson argues that the defense practice of avoiding a death sentence for a capital defendant has changed considerably since 1993, all amounting to a change in the law pursuant to §1B1.13(c). Jackson argues, if done today, a mitigation specialist would uncover details in Jackson's life and characteristics that would serve to advocate for less than a life sentence.

1. Family Circumstances.

Section 1B1.13(b)(3)(C) provides that extraordinary and compelling circumstances may be shown when a defendant's parent, who because mental or physical disability or a medical condition, is incapable of self-care and the defendant would be the only available caregiver for that parent. Jackson provided ample evidence of the seriousness of his mother's medical conditions and her inability for self-care. See dkt.#277, Ex. 5 (expert assessment of mother's medical and mental health conditions), Ex. 6 (letter from Carol Jackson), and Ex. 7 (declaration of investigator regarding Ms. Jackson's needs and the reality of her care). The government points out that Jackson's sister is one, but not the only available caregiver for Ms. Jackson and presents that information in a sealed exhibit at dkt.#287.

The court empathizes with Ms. Jackson's situation; however, it is not so unusual from similar aging parents. The court appreciates the burden on Jackson's sister but hopes that others

will come forward now to assist her. The mother's conditions and needs do not comprise "extraordinary and compelling" under the policy statement.

      2.   Other Reasons: Youthfulness, Difficult Upbringing, Geographic Anomaly, and Rehabilitation.

      a.   Jackson's Age at the Time of Commission of the Offense.

Jackson argues that he was only 20 years of age when he committed the crimes for which he was convicted, and according to neurologists and psychologists, his brain was not fully developed. See dkt.#277 Ex. 9 – "Adolescents Risk Taking and Brain Development" by Dr. Eva H. Telzer. Therefore, he should be held less responsible for his actions.

Very recently, the Ninth Circuit, in *United States v. Bryant*, 144 F.4th at 1126, held that a defendant's youth at the time of his offense is not "similar in gravity" as required in §1B1.13(b)(5) to the other circumstances listed in §1B1.13(b)(1) – (4). The court distinguished youth at time of commission of the offense from circumstances "where continued incarceration risks a defendant's health or safety or would severely burden third parties unable to care for themselves." *Id.* (citations omitted). The court pointed out that the circumstances listed in §1B1.13(b)(1) – (4) refer to circumstances that develop after sentencing, giving a means for relief. By contrast, the defendant's age "is an immutable fact – one that was known to the sentencing judge, and which could be considered from the start in imposing sentence." 144 F.4th at 1127. The court also held that a defendant's youth can be considered in the third step as part of the 18 U.S.C. §3553(a) factors. *Id.*

In discussing the application of the *Bryant* decision on Jackson's motion, the defense invites the court to ignore the holding as it is based on incomplete history of the Sentencing Commission's enactment of §1B1.13(b)(5) and its intention in drafting the phrase "similar in gravity". Dkt.#297, pp.4-8. Further, Jackson contends that the Ninth Circuit did not address post-

ORDER DENYING DEFENDANT'S MOTION TO REDUCE SENTENCE - 7

sentencing developments in neuroscience and brain development because such was not presented to it.

This court is unwilling to ignore the holding in *Bryant* that youth does not fall under the policy statement in §1B1.13(b)(5). That is the law in this circuit and that is the law that this court must apply. Jackson's youth cannot be considered as an extraordinary and compelling circumstance for a reduction of his sentence. This court will further consider Jackson's age as part of the application of 18 U.S.C. §3553(a) factors in Section 4 herein.

      b.  Difficult Upbringing.

Jackson presents much information about Compton, California, the city where he was raised until his late teens. In the materials from Dr. M. Keith Claybrook, Compton's history is vividly described as a violent, poverty-stricken, and racially unjust place of which Jackson was a victim. See Ex. 8 (dkt.#277 sealed) Growing up, Jackson regularly witnessed shootings and assaults as part of gang activity, drug dealing and usage, and police misconduct and use of excessive force. His home life was dominated by his older brother and co-defendant Paige because his parents were working and away from the home. Jackson's parents tried to give their sons a better life. See letter from Carol Jackson, dkt.#277-6(sealed)

While Jackson's childhood was clearly traumatic and violent, it was not, in the court's judgment, extraordinary or compelling. Mr. Paige described their home life as "a loving household. A beautiful and understanding mother who loved us dearly and continues to do so now and a stern disciplinarian father who loved us. We loved each other." Dkt.#277-11, p.2(sealed).

      c.  Geographic Anomaly.

Jackson argued that the location of the murders was approximately a mile from the border of Fort Lewis Military Reservation and Pierce County, Washington. If the crime took place in the State of Washington, then Jackson might be entitled to a sentence less than life without parole. Such sentences for defendants aged 18 to 20 years were held unconstitutional under the Washington State Constitution in *In Re Monschke*, 197 Wash.2d 305, 483 P.3d 276 (2021). The government's response to this argument is well taken – Jackson chose the jurisdiction by deliberately going onto the federal reservation to commit the crimes. See dkt.#285 at p.17. Unfortunately, such a coincidence is not an extraordinary or compelling circumstance. Nor is the government's choice of jurisdiction extraordinary or compelling. Such choices are a normal part of criminal trial practice.

    d.   Jackson's mother's circumstances.

The court refers to Section B.1 herein for the consideration of Ms. Jackson's circumstances. The fact that there may be other caregivers available to Ms. Jackson is not the only flaw in Jackson's argument. Again, while difficult, Ms. Jackson's situation does not amount to extraordinary or compelling circumstances in her son's life.

    e.   Jackson's Rehabilitation.

Jackson presents much material to demonstrate how he has grown and matured since May 1993 when he was sentenced to life imprisonment. In Exhibit 8 to his Reply (dkt.#297-8), he presented a list of the various programs and classes he has completed since his incarceration in 1993. As part of his pro se motion in Exhibit A, he presented a series of certificates of some of these programs. Dkt.#231, pp.37-65. Friends and family wrote letters describing the changes in Jackson since his arrest. See dkt.#277-6, 11. 14,15,16,17,18,19, and 23. (sealed).

The government pointed out that Jackson has had numerous infractions during his incarceration, the last two being within five years of this motion. In his Reply, Jackson presents the Declaration of Maureen P. Baird, a Bureau of Prisons expert, to explain the background of the 19 infractions and their relative seriousness, particularly the most recent one of possession of a weapon. Dkt.#297-6, Ex.6, pp.16-19(sealed). Further, Jackson filed a declaration from Mahkaea Jackson-Sama, an investigator with the Federal Public Defender, regarding her conversation with his former cellmate, Larondon Hembry. Mr. Hembry told her that the weapon referred to in the infraction was actually his, not Jackson's. He further stated that Jackson took responsibility for the weapon because Hembry was about to be released. Dkt.#297-7. Ms. Baird stated it was common for an inmate sentenced to life to take responsibility for an infraction in order to help the guilty inmate avoid discipline that might affect his release. Dkt.#297-6, pp.7-8. The Hembry disclosure provides an explanation, but the infraction remains on Jackson's record.

The court commends Jackson for his efforts at rehabilitation during his incarceration. The seriousness of his infraction history dates back to the first 10 years or so of his prison time, and the two recent infractions do not diminish his maturation and self-improvement.

By comparison, the following cases are examples of better records of rehabilitation that resulted in a finding of extraordinary and compelling. *See e.g. United States v. Cruz*, No. 3:94-CR-112 (JCH), 2021 WL 1326851 (D. Conn. Apr. 9, 2021)(After more than 26 years in BOP custody, including at maximum, minimum, and now low-security federal penitentiaries, Cruz has never received a disciplinary ticket.); *United States v. Rios*, No. 3:94CR112 (JBA), 2020 WL 7246440 (D. Conn. Dec. 8, 2020) (During 26 years of imprisonment, Rios has accrued seven disciplinary infractions, none in the past four years and only one of which involved violence); *United States v. Lebaron*, No. CR H-92-177-05, 2023 WL 7308116 (S.D. Tex. Nov. 6,

2023)(defendant completed numerous rehabilitative programs and 300 hours of college correspondence courses with only one minor disciplinary infraction during the past ten years of her incarceration.). *United States v. Rodriguez*, 492 F.Supp.3d 306, 308 (S.D.N.Y. 2020)(Defendant's rehabilitation is "remarkable. An extraordinary collection of letters, [ ] and, most important, 27 members of the prison staff [shows that he] has used his twenty years in prison not just to better himself but also to better his community."). Subsection 1B1.13(d) states that "rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for the purposes of this policy statement." This section goes on to state that rehabilitation of the defendant "may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted." While admirable, Jackson's rehabilitation, even in combination with other circumstances, does not rise to the level of an extraordinary and compelling circumstance.

      3.   Changes in the Law.

Jackson argues that pursuant to §1B1.13(b)(6), he has served more than 10 years of his sentence and there has been a change in the law that creates a "gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion [for compassionate release] is filed. *Id*. Jackson lists the changes in the law to include changes in defense strategy for a capital defendant, neuroscience in assessing criminal culpability, and the imposition of fewer life sentences beginning around 2016. Jackson presents a list of cases that showcase where courts have reduced life sentences for murder to time served or a specific period of years. See Ex.4 (dkt.#297-4).

Jackson is incorrect that the law pertaining to his sentence in 1993 versus 2023 has changed. On the murder count, he was sentenced under 18 U.S.C. §1111. That statute has not

ORDER DENYING DEFENDANT'S MOTION TO REDUCE SENTENCE - 11

changed from 1993, and the sentence options are the same today as they were in 1993: death or life imprisonment. The court can see in the statistics that Jackson presents and cases cited that modern trend is away from life sentences for drug trafficking crimes. *See e.g. United States v. Shaw*, 95-CR-0894 (So. D. Fl 2024) (dkt.#297-2) (life sentence for drug trafficking reduced to 25 years). That case is not this case.

The court reviewed the list of cases Jackson cites as examples of life sentence reductions for murder. There is one glaring dissimilarity between this case and all of those cases. This case deals with Jackson killing, personally, brutally, and with premeditation an adult and two innocent children, an 18-month-old child and a four-year-old child. He was present and an accomplice to the killing of a third innocent child, a seven-year-old boy who was hiding in a closet. The cases cited by the defense deal with murders of adults engaged in competing criminal behavior in environments where murders were not unexpected. *See e.g. United States v. Jones*, No.3:99-CR-264-1(VAB), 2020 WL 2791862 (D.Conn. May 29, 2020)(defendant engaged in violent drug trafficking organization and killed people competing with his enterprise); *United States v. Russo*, No. 90-CR-1062m 2022 WL 17247005 (E.D.N.Y. Nov. 28, 2022)(defendant a leader in a crime family that ordered the murder of two members of a rival group); *United States v. Tidwell*, 476 F.Supp.3d 66 (E.D. Pa. 2020)(defendant a leader in drug trafficking organization and helped in the murder of two rival drug dealers). These examples are unlike the facts and seriousness here.

Jackson argues that if the court knew at the time of sentencing in 1993 everything that Jackson presents in his motions, the court might not have sentenced him to life. He argues that the use of a mitigation specialist has become routine in recent years for the defense of capital cases and might have given the court critical background information on Jackson. See Declaration of Russell Stettler, dkt.#277-1 (sealed).

Jackson's arguments are not convincing. First, the court had no legal choice regardless of what would have been presented with a mitigation specialist, because Jackson pled guilty to a crime that required a death sentence or a mandatory life sentence. Second, Jackson made a deal with the government to spare his life in exchange for a life sentence. He couldn't ask the court for a lesser sentence without breaching the terms of his Plea Agreement. Third, his three lawyers did what lawyers today do with a capital case – worked hard to save the life of the defendant. That has not changed and does not rise to the level of a an unusually long sentence under §1B1.13(b)(6) or a change in the law as contemplated by §1B1.13(c), to be extraordinary and compelling.

    4.   Third Step – Consideration of 18 U.S.C. §3552(a) Factors

The third step in the analysis of Jackson's motion is to apply the nine factors in 18 U.S.C. §3553(a). Those factors include the nature of the offense, history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the crime, promote respect for the law, to afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, consider any pertinent policy statement, and to avoid unwarranted sentence disparities among defendants convicted of similar crimes with similar records. §3553(a)(1), (2), (5) and (6).

This decision has addressed the nature of the offense and to some extent the history and characteristics of the defendant. What is missing is an assurance that Jackson will not act out in violent and raging behavior as he did on December 4, 1992. Simply being older, wiser, and calmer does not give the court comfort that Jackson's behavior on that day will not exhibit itself under some scenario in the future. In order for the public to respect the law and justice system

and to deter similar conduct, the sentence for murder, and especially four murders, must be severe.

Finally, regarding sentence disparity, Jackson's co-defendants James Mayfield and Gregory Paige both filed motions for compassionate release making similar arguments as Jackson makes. See dkt.#189 by Paige; dkt.#198 by Mayfield. Both of these defendants received life sentences, and the court denied both of their motions for resentencing. See dkt.#214(Mayfield); #227(Paige). In its decision denying the Amended Motion for Compassionate Release, the court noted that Paige did not kill anyone, but he helped plan the crime, he drove the getaway car, and he helped with clean-up of the bloody mess that resulted from the crime. Dkt.#227 at 6. Mayfield has been a model inmate during the same term as Jackson and he has not received one infraction. In its decision denying his motion for compassionate release, the court stated that Mayfield participated in one of the most, if not the most, serious crimes that the court has seen. Dkt.#214 at 5-6. The court questioned, as the court questions here, whether Mayfield and Jackson have forgotten what they did on December 4, 1992. The court determines that unwarranted sentence disparity would exist if the court granted Jackson a reduction in his sentence but denied a sentence reduction to Mayfield and Paige for the same conduct with similar records.

For all these reasons, Jackson fails to show extraordinary and compelling circumstances pursuant to 18 U.S.C. §3582(c)(1)(A) and the policy statement in USSG §1B1.13 to warrant a reduction in his sentence. Further, the application of 18 U.S.C. §3553(a) factors do not support a lesser sentence. A life sentence is sufficient but not greater than necessary for Jackson.

Therefore, it is hereby

ORDER DENYING DEFENDANT'S MOTION TO REDUCE SENTENCE - 14

ORDERED that Defendant Damien L. Jackson's Motion to Reduce Sentence (dkt.##231; 277) is DENIED.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing pro se at said party's last known address.

Dated this 24th day of September, 2025.

*Robert J. Bryan*
ROBERT J. BRYAN
United States District Judge